**UNITED STATES, Appellee,**

v.

**Staff Sergeant Charles G. WILLENBRING, United States Army, Appellant.**

**ARMY 9801505.**

U.S. Army Court of Criminal Appeals.

12 Dec. 2001.

For Appellant: Captain Jimmonique R.S. Rodgers, JA (argued); Major Jonathan F.

Potter, JA; Major Kirsten V.C. Brunson, JA (on brief); Major Mary M. McCord, JA; Captain Jimmonique R.S. Rodgers, JA (supplemental brief); Lieutenant Colonel David A. Mayfield, JA.

For Appellee: Captain William J. Nelson, JA (argued); Lieutenant Colonel Edith M. Rob, JA; Major Daniel G. Brookhart, JA (on brief); Colonel David L. Hayden, JA; Lieutenant Colonel Edith M. Rob, JA; Major Daniel G. Brookhart, JA; Captain William J. Nelson, JA (supplemental brief).

Before CURRIE, JOHNSON, and NOVAK, Appellate Military Judges.

## OPINION OF THE COURT

CURRIE, Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of three specifications of rape, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [hereinafter UCMJ]. Appellant was sentenced to a dishonorable discharge, confinement for thirty-six years, forfeiture of all pay and allowances, and reduction to the grade of Private E1. Pursuant to a pretrial agreement, the convening authority approved twenty years of the sentence to confinement and the remainder of the sentence as adjudged. This case is before the court for mandatory review pursuant to Article 66, UCMJ, 10 U.S.C. § 866.

On 23 July 1997, we denied, in an unpublished opinion, appellant's petition for extraordinary relief in which he challenged the court-martial's jurisdiction over him and argued that prosecution was barred by the statute of limitations. The U.S. Court of Appeals for the Armed Forces affirmed our decision. *Willenbring v. Neurauter,* 48 M.J. 152 (1998).

Appellant now alleges, *inter alia,* that the court-martial lacked in personam jurisdiction; that the conditions of his pretrial confinement violated Article 13, UCMJ, 10 U.S.C. § 813; and that his sentences to confinement by court-martial and the state of North Carolina should run concurrently. We disagree.

## I. JURISDICTION

### BACKGROUND

Appellant was court-martialed for raping three women while on active duty as a member of the Regular Army. He committed the first rape in the vicinity of Champaigne, Illinois, in 1987. In November 1988, he raped the wives of two fellow soldiers at Fort Belvoir, Virginia. In 1992, appellant left active duty for service in the reserve component. On 1 November 1996, North Carolina placed appellant in pretrial confinement after charging him with four rapes and two kidnappings unrelated to the rapes he committed in Illinois and Virginia. On 21 February 1997, the Army ordered appellant to active duty pursuant to the applicable version of Article 2(d), UCMJ, 10 U.S.C. § 802(d),[1] to be court-

---

1. Article 2(d), UCMJ, as enacted in 1950 and amended in 1987, states:

     (d)(1) A member of a reserve component who is not on active duty and who is made the subject of proceedings under section 815 (article 15) or section 830 (article 30) with respect to an offense against this chapter [10 U.S.C. §§ 801 et seq.] may be ordered to active duty involuntarily for the purpose of—
     (A) investigation under section 832 of this title (article 32);
     (B) trial by court-martial; or
     (C) nonjudicial punishment under section 815 of this title (article 15).
     (2) A member of a reserve component may not be ordered to active duty under paragraph (1) except with respect to an offense committed while the member was
     (A) on active duty; or
     (B) on inactive-duty training, but in case of members of the Army National Guard of the

United States or the Air National Guard of the United States only when in Federal service.
     (3) Authority to order a member to active duty under paragraph (1) shall be exercised under regulations prescribed by the President.
     (4) A member may be ordered to active duty under paragraph (1) only by a person empowered to convene general courts-martial in a regular component of the armed forces.
     (5) A member ordered to active duty under paragraph (1), unless the order to active duty was approved by the Secretary concerned, may not—
     (A) be sentenced to confinement; or
     (B) be required to serve a punishment consisting of any restriction on liberty during a period other than a period of inactive-duty training or active duty (other than active duty ordered under paragraph (1)).

martialed. On 24 February 1997, he was involuntarily activated. The charge was preferred against appellant on 26 February 1997. North Carolina released appellant to the Army the next day. On 30 April 1997, the charge was referred to a general court-martial.

The jurisdictional issue initially before us and our superior court concerned the power of a court-martial to try appellant under the versions of Articles 2(d) and 3(a),[2] UCMJ, 10 U.S.C. § 803(a), applicable to his case.

In its opinion, our superior court described appellant's military service as follows:

Appellant enlisted in the United States Army for a period of 4 years on January 13, 1982. He twice extended that period of enlistment and then reenlisted for a period of 6 years on September 30, 1988. Prior to expiration of that enlistment, on March 9, 1992, appellant requested an early separation to accept a civilian job offer, stating: "I am willing to serve my remaining time in service in the Active Reserves." His request was approved on March 10, 1992, with his separation from active duty to become effective on March 31, 1992.

On March 13, 1992, while still on active duty, appellant signed an enlistment contract with the United States Army Reserve, which noted, among other matters: that his enlistment was "more than an employment agreement"; that he would be "[r]equired to obey all lawful orders and perform all assigned duties"; that he would be "[s]ubject to the military justice system, which means among other things, that [he could] be tried by military courts-martial [sic]"; and that he would be "[r]equired upon order to serve in combat or other hazardous situations."

Appellant was discharged from active service on March 31, 1992, and began his term of enlistment in the Army Reserve on April 1, 1992. He remained a member of the Army Reserve by virtue of an exten-

sion of his 1992 enlistment, followed by a 3–year reenlistment, which began on February 26, 1994.

*Willenbring,* 48 M.J. at 154.

Appellant asserted in his petition for extraordinary relief that "the court-martial did not have jurisdiction to try him for the charged offenses because Article 2(d) authorizes jurisdiction only over offenses committed while he was on active duty in the reserves, not over offenses that occurred while he was on active duty in a regular component." *Id.* at 159. The government argued that Article 2(d), UCMJ, gave it jurisdiction to try appellant, if properly activated to active duty, for any offense he committed while on active duty, "regardless of any intervening discharge or other break in service." *Id.* Our superior court rejected both arguments.

The court noted that consideration also must be given to Article 3(a), UCMJ. The court traced and explained the legislative and judicial history of Articles 2 and 3, UCMJ, and their relationship to each other. We need not repeat the court's analysis. It is sufficient here to say that the court defined the law of personal jurisdiction with respect to reservists under the applicable versions of Articles 2 and 3, UCMJ, as follows:

If there was a complete termination of military status with no subsequent military service, then the former servicemember would not be subject to court-martial jurisdiction for prior-service offenses as a matter of constitutional law under [*United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955)]. If, however, there was a complete termination of military status followed by reentry into reserve service, then the reservist would be subject to court-martial jurisdiction for prior-service offenses, subject to the major offense and nontriability conditions of Article 3(a). Finally, if there was a change in status between regular and reserve ser-

---

**2.** Article 3(a), UCMJ, before amendment in 1992, stated:

Subject to section 843 of this title (article 43) [the statute of limitations], no person charged with having committed, while in a status in which he was subject to this chapter, an offense against this chapter, punishable by con-

finement for five years or more and for which the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia, may be relieved from amenability to trial by court-martial by reason of the termination of that status.

vice, or within various forms of reserve service, unaccompanied by a complete termination of military status, then the reservist would be subject to court-martial jurisdiction for all prior-service offenses to the same extent as a regular whose military status had changed in form without a complete termination of military status.

*Willenbring,* 48 M.J. at 170.

The court defined the rather narrow jurisdictional issue now before us by instructing the trial judge "to make findings of fact and conclusions of law specifically directed to the issue of termination of service. If there was such a complete break, then it will be necessary to consider whether the criteria of the applicable version of Article 3(a) have been met." *Id.* at 175.[3]

### STANDARD OF REVIEW

Whether appellant's discharge from the active component on 31 March 1992 was a "complete termination of service" is a mixed question of law and fact. We employ a clearly-erroneous standard to review the military judge's findings of fact and review de novo his conclusions of law. *See United States v. Melanson,* 53 M.J. 1, 2 (2000) ("When an accused contests personal jurisdiction on appeal, we review that question of law *de novo,* accepting the military judge's findings of historical facts unless they are clearly erroneous or unsupported in the record. *See United States v. Owens,* 51 M.J. 204, 209 (1999).").

### FACTS

The evidence amply supports the military judge's findings and, with one minor exception, we adopt them as our own. UCMJ art. 66(c). They are, in pertinent part, as follows:

Around February or early March 1992, [appellant] received a civilian job offer and requested an exception to policy in the separation regulation, AR 635–200, Chapter 5–3, for a civilian job offer. That request was denied. [Appellant] on 9 Mar 92 submitted a [Department of the Army] Form 4187 (Personnel Action) requesting reconsideration of his request for release from active duty and stated: "I am willing to serve my remaining time in service in the Active Reserves." His ETS at the time under his then current enlistment was September 1994.... His battalion-level commander recommended approval of that request on 9 Mar 92, and Department of the Army Separations and Appeals Branch on 10 Mar 92 approved that request with a separation date of 10 Mar 92.[4] On 13 Mar 92, [appellant] enlisted in the U.S. Army Reserve for a term of 1 year under a "Transition Enlistment." He enlisted for specific assignment to Co D, 2d Bn Tng, Spt Bde, Jones Point, USARC, Alexandria, VA, requesting reserve component assignment orders for assignment to that unit. Those orders were issued that day, 13 Mar 92, assigning him effective 1 Apr 92 to that unit. [Appellant] in his Request for Component Assignment Orders ... requested to continue his SGLI coverage. In his enlistment contract of 13 Mar 92, [appellant] acknowledged and initialed his understanding that "this enlistment will require that I commence training with a troop program unit immediately. I will be required to maintain satisfactory participation in the Ready Reserve for the entire period of service stipulated in the enlistment document to which this is attached." [Appellant's Department of Defense (DD) Form] 214[5] reflected his transfer to his reserve unit—D Co, 2d Bn .... [Appellant] acknowledged in February 1995 ... on a retirement points calculation that he

3. We note, as did our superior court, that the current version of Article 3(a), UCMJ, which is applicable only to offenses occurring on or after 23 October 1992, "makes it clear that[, subject to the statute of limitations,] a servicemember who is discharged from and then reenters the armed forces after a break in service may be tried for offenses that occurred during a prior enlistment, regardless of the intervening discharge." *Willenbring,* 48 M.J. at 158. In other words, for offenses committed on or after 23 October 1992, the current version of Article 3(a), UCMJ, moots the jurisdictional issue before us.

4. The military judge's finding that appellant's separation date was 10 March 1992 was clearly erroneous. The memorandum granting appellant's request for discharge explicitly states, "[Appellant] will be separated on 31 Mar 92."

5. Certificate of Release or Discharge from Active Duty.

had served on active duty until 31 Mar 92 and began his reserve duties on 1 Apr 92. Record at Appellate Exhibit LXXXIX at 1.

The military judge then found that appellant "did not have a complete break in service and that his military service was continuous." *Id.* at 2.

### DISCUSSION

■ Appellant argues that because he had no obligation—in writing or by statute or regulation—to enlist in the reserves when he was discharged on 31 March 1992, his discharge completely terminated his service. In particular, he contends that the approving authority for his discharge did not explicitly place any conditions on his discharge. He also notes that when a discharge is conditioned upon acceptance of further military service, the pertinent regulation states the soldier will be reenlisted on the day following the discharge and will not receive the discharge certificate until he or she has reenlisted. Army Reg. 635–200, Personnel Separations: Enlisted Personnel, para. 16–3 (17 Sep. 1990)[hereinafter AR 635–200]. Appellant received his DD Form 214 before being discharged from the active component and reporting to his reserve unit. He cites *United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621 (1949), *Smith v. Vanderbush*, 47 M.J. 56 (1997), and *United States v. Howard*, 20 M.J. 353 (C.M.A.1985), as "directly analogous" to his case.

The government counters that appellant's service did not terminate on 31 March 1992, despite the discharge, and asserts that appellant instead "clearly intended to make a seamless transition into the Army Reserves, as evidenced by both the timing and terms of his Reserve enlistment."

We first note that *Hirshberg, Vanderbush,* and *Howard* differ significantly from appel-

lant's case. Hirshberg reenlisted the day after he was discharged upon completing his prior enlistment. He had no obligation to reenlist, and there was a break of several hours between his discharge and reenlistment. *Hirshberg,* 336 U.S. at 213, 69 S.Ct. 530. Moreover, as Judge Effron noted, the drafters of the 1951 Manual for Courts–Martial cautioned that *Hirshberg* "should not be read as applying to 'cases where there is no hiatus but merely a change in particular status within the general status of being a person subject to military law.'" *Willenbring,* 48 M.J. at 163–64 (citing *Legal and Legislative Basis, Manual for Courts–Martial, United States,* 1951, at 12–13).

Jurisdiction was lost in *Vanderbush* because the accused was discharged upon completing his obligated term of service, despite the fact that he had been arraigned earlier. Vanderbush did not reenlist, so the discharge severed all of his ties to the military. *Vanderbush,* 47 M.J. at 57. In *Howard,* the question was the effective date and time of the accused's discharge and the Army's subsequent loss of jurisdiction. Our superior court held, consistent with the findings of fact made by the military judge, that Howard's commander had made an "informed decision to allow [Howard] to be discharged at an earlier time when he authorized [Howard] to pick up his discharge certificate, as well as his DD Form 214 and travel pay, and allowed him to be released from the boundaries of the military reservation." *Howard,* 20 M.J. at 354–55; *see also Melanson,* 53 M.J. at 2–4 (describing the three conditions precedent to a lawful discharge and limiting *Howard* to its facts).

While we have found no case that specifically defines "complete termination of military status," the discussion to Rule for Courts–Martial [hereinafter R.C.M.] 204(d) [6]

---

6. R.C.M. 204(d) states:
A member of a reserve component at the time disciplinary action is initiated, who is alleged to have committed an offense while on active duty or inactive-duty training, is subject to court-martial jurisdiction without regard to any change between active and reserve service or within different categories of reserve service subsequent to commission of the offense. This subsection does not apply to a person whose

military status was completely terminated after commission of an offense.
In 1987, the President promulgated R.C.M. 204, which implemented the amendments to Articles 2 and 3, UCMJ, contained in the Military Justice Amendments of 1986, National Defense Authorization Act for Fiscal Year 1987, Pub.L. No. 99–661, § 804, 100 Stat. 3906–07 (1986). These amendments addressed, in part, the jurisdictional gap over reservists recognized in *United States*

states, "A 'complete termination' of military status refers to a discharge relieving the servicemember of any further military service. It does not include a discharge conditioned upon acceptance of further military service." Our superior court, by remanding the case to the trial judge to "specifically address the issue of whether appellant's military status was 'completely terminated' for purposes of RCM 204(d)," implied that one question to be answered turns on whether there was a "direct relationship between [appellant's] discharge and [his] reserve enlistment." *Willenbring*, 48 M.J. at 170. If a direct relationship exists, termination is not complete.

Appellant requested a discharge effective thirty months before he would have completed his obligated tour of duty. It was denied. He then asked that his request be reconsidered, linked to his promise to serve his remaining obligation in the Active Reserves. It was then that he gained his commander's support. More than two weeks before his discharge was to take effect, appellant signed an enlistment contract for the reserves, took his oath of office, and received orders assigning him to his new reserve unit. The DD Form 214 reflected his transfer to his new reserve unit. His enlistment in the reserves was characterized as a transition enlistment. His receipt of the DD Form 214 after he enlisted in the reserves but before he reported to his reserve unit did not alter appellant's intent or modify the conditional nature of his discharge. We are convinced appellant's discharge was directly conditioned upon acceptance of further military duty.

We also find, as our superior court did in *United States v. Clardy,* 13 M.J. 308 (C.M.A. 1982), that there was no break in appellant's service or status. Clardy was court-martialed for an offense he committed during a previous enlistment. The court held that the court-martial had jurisdiction because Clardy had been discharged from the prior enlistment early solely for the purpose of reenlisting; therefore, his military status remained uninterrupted. The court stated, "[T]he per-

son who is discharged before the expiration of his term of enlistment for purposes of immediate reenlistment has experienced no termination of—and no hiatus in—his 'active service.' He has remained continuously in 'active service' at all times, *despite his receipt of a discharge from the prior enlistment." Id.* at 316 (emphasis added); *cf.* R.C.M. 202(a) discussion, para. (2)(B)(iii)(*f*) ("When a person's discharge or other separation does not interrupt the status as a person belonging to the general category of persons subject to the code, court-martial jurisdiction over that person does not end."). Such is the case here.

Moreover, appellant's discharge was effective at 2400, 31 March 1992. AR 635–200, para. 1–31*d.* Appellant's change in status (active to reserve) occurred on 1 April 1992. There was no more a break in appellant's service or status than there is a break in time as one day or year turns to the next. Appellant accomplished exactly what he intended: a seamless transition from active duty to the reserves in order to take a job in the private sector, while retaining his ties to the Army. *Cf.* Army Reg. 140–111, Army Reserve: U.S. Army Reserve Reenlistment Program, para. 1–9 (1 Jan. 1983) (a complete break in service occurs when a soldier does not immediately reenlist or extend within twenty-four hours after the expiration of his term of service).

We hold that the court-martial had and properly exercised jurisdiction over appellant. There was a direct relationship between appellant's discharge and his enlistment in the reserves, and there was no complete termination of appellant's military status under the statutes and Manual for Courts–Martial applicable to appellant. As there was no complete termination of appellant's military service, we need not consider whether the criteria of the applicable version of Article 3(a), UCMJ, have been met. *Willenbring*, 48 M.J. at 175.

---

*v. Caputo,* 18 M.J. 259 (C.M.A.1984) and its progeny, and ensured that jurisdiction over reservists would not be lost for offenses committed on active duty or on inactive-duty training merely

because the accused returned to civilian life at the end of a period of such duty. *Willenbring,* 48 M.J. at 168–69.

## II. PRETRIAL PUNISHMENT

Appellant alleges that the circumstances and conditions of his pretrial confinement constitute unlawful pretrial punishment in violation of Article 13, UCMJ. We disagree.

### *ARTICLE 13, UCMJ*

■ Article 13, UCMJ, states:

No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances required to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

Unlawful pretrial punishment "entails a purpose or intent to punish an accused before guilt or innocence has been adjudicated." *United States v. McCarthy*, 47 M.J. 162, 165 (1997). The imposition of "unduly rigorous circumstances during pretrial detention [may,] in sufficiently egregious circumstances[,] ... give rise to a permissible inference that an accused is being punished, or may be so excessive as to constitute punishment." *Id.; see also Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (conditions or restrictions which are arbitrary or purposeless or are not reasonably related to a legitimate government objective may allow an inference that the purpose for them is punishment); *United States v. James*, 28 M.J. 214, 216 (C.M.A.1989); *United States v. Palmiter*, 20 M.J. 90, 95 (C.M.A.1985); R.C.M. 304(f).

### *FACTS*

Appellant vigorously litigated this issue at trial before two military judges both before and after he filed his petition for extraordinary relief. Appellant testified the second time he raised the issue. Appellant also has provided us a post-trial affidavit, which we have considered. Both military judges made findings of fact before denying appellant's requests for relief. As the record amply supports their findings, we consolidate, summarize, and adopt their findings below.

Before his transfer to military custody, North Carolina placed appellant in pretrial confinement on four counts of first-degree rape and two counts of first-degree kidnapping, and set bail at $1.1 million. Upon appellant's return to military control, appellant's commander determined he was a flight risk and likely to engage in serious criminal misconduct if released, and ordered appellant into pretrial confinement. Reviewing officials agreed. Appellant was confined in the Marine Corps Base Brig, Quantico, Virginia, a Department of Defense regional confinement facility that houses short term prisoners (those with sentences of five years or less) and pretrial confinees. Brig authorities placed appellant in maximum custody, and he remained in that status throughout his pretrial confinement.

Master Gunnery Sergeant Murphy, Brig Officer and a correctional specialist for twenty-five years, testified about how he and other brig officials determined appellant's custody classification and the circumstances of his pretrial confinement. They knew that the alleged rapes for which appellant was pending court-martial had been committed at knife point; that appellant allegedly had committed four rapes "as well as a variety of other crimes" in North Carolina; that appellant had been in the custody of North Carolina since 1 November 1996 and was being held in lieu of posting a $1.1 million bond; that in 1993 appellant had been convicted in Prince William County, Virginia, for indecent exposure, voyeurism, and unlawful entry; and that appellant had "admitted to a history of criminal behavior, including numerous acts of sexual deviancy, to wit: voyeurism, public masturbation, and rape."

Brig officials concluded appellant was potentially dangerous or violent and a flight risk because of "the seriousness of [the] charges, his criminal history, pending civil charges, pattern of poor judgment, and the potential for a lengthy sentence" to confinement in two jurisdictions, if convicted. Applying the pertinent regulation governing the operation of Navy and Marine Corps confinement facilities, brig officials placed appellant in maximum custody. *See* Dep't of Navy, Office of the Secretary Instruction 1640.9B,

Department of the Navy Corrections Manual, paragraph 4201.2a (2 Dec. 1996) [hereinafter SECNAVINST 1640.9B] (maximum custody prisoners "requir[e] special custodial supervision because of the high probability of attempted escape or because they are dangerous or violent and whose escape would cause concern of a threat to life or property"). Brig officials reviewed appellant's custody status periodically, usually biweekly.

As a maximum custody confinee, appellant required immediate and continuous supervision. SECNAVIST 1640.9B, para. 4201.2a(1). To this end, appellant was housed in Special Quarters 1(SQ1). Special Quarters 1 cells measure six feet wide by eight feet long by eight feet high, with a sink, latrine, rack (bed), chair or student desk, and footlocker. As a military confinee, appellant's daily routine was regulated. From reveille (0500 on weekdays and 0600 on weekends and holidays) until 1800 on duty days, appellant could not sit or lie on his rack. On weekends and holidays he could sit or lie on his rack after 1000. These rules applied to all prisoners and confinees.

Appellant remained confined in his cell most of the time, including meals. He could communicate with other prisoners in the cells next to him, although those cells were often empty. He showered for ten minutes daily. On Mondays through Fridays, appellant usually was taken outside for a one-hour "sunshine call" where he could walk, smoke, and talk with other maximum custody prisoners and confinees. Three times a week, he received a one hour indoor recreation call where he could watch television, listen to the radio, play cards or games with other maximum custody prisoners, exercise within limits, or read and write letters. On Saturday and Sunday mornings, he could watch a movie. Appellant could not attend church services as a maximum custody confinee, but the brig chaplain visited him regularly. Appellant requested permission to listen to a Christian radio program, and a radio was brought to him for that purpose. He was not permitted to work.

On two occasions, brig personnel acted inappropriately by going through appellant's private papers. Also, for five days, appellant had to wear leg restraints in the shower. Appellant complained, and this practice ceased.

During appellant's detention, at least two other pretrial confinees charged with rape were placed in maximum custody. Upon conviction and sentencing, the custody classification of at least one of these individuals was upgraded to medium custody. Appellant, in his post-trial affidavit, avers that after he was convicted and sentenced, he too was upgraded to medium custody.

The second military judge found "that the brig authorities' decisions to place and keep [appellant] in maximum custody status were supported by reasonable and legitimate governmental interests (including safety and security of the facility and to ensure [appellant's] presence at trial)." He also found "no evidence, with several limited exceptions, that there was any intent to punish [appellant] before guilt or innocence [had] been adjudicated or that there were unduly rigorous circumstances that were so excessive as to constitute punishment." He awarded appellant five days confinement credit for the days he had to wear shackles to and in the shower, and one day for each of the two acts of misconduct by brig personnel involving appellant's private papers. The military judge also recognized that appellant's living conditions were "spartan" and considered them on sentencing. He otherwise denied the motion.

### STANDARD OF REVIEW

Issues of illegal pretrial punishment involve mixed questions of law and fact. *United States v. Smith*, 53 M.J. 168, 170 (2000). We review conclusions of law de novo. *Id.; see also McCarthy*, 47 M.J. at 167. "The military judge's factual finding that there was no intent to punish is reviewed under a clearly erroneous standard of review." *Smith*, 53 M.J. at 170 (citing *United States v. Phillips*, 42 M.J. 346 (1995)).

### DISCUSSION

■ Our review of the record supports the military judges' findings and convinces us that brig officials did not place appellant in

maximum custody to punish or inflict any penalty upon him. The record establishes a litany of violent, predatory, and dangerous criminal behavior by appellant over a period of years. Brig officials clearly had reason to believe that he was a flight risk and posed a risk to others. The fact that appellant generally behaved during his pretrial confinement does not mean brig officials erred by placing appellant in maximum custody, nor does it establish an intent to punish. *Cf. McCarthy,* 47 M.J. at 167–68 (brig authorities made decisions based on information available to them at the time; appellant's "subsequent good behavior [did] not serve to revise the facts as they existed and were known to brig authorities at the time of classification").

We also are convinced that the manner of detention was for legitimate, nonpunitive reasons, i.e., to secure and safeguard the confinement facility and to insure appellant's presence at trial. *See generally Smith,* 53 M.J. at 172; *United States v. Huffman,* 40 M.J. 225, 226–29 (C.M.A.1994). Custodial and supervisory requirements, the threats appellant posed, the brig's facilities, the lack of manpower, the need to protect brig personnel and other prisoners and detainees, and the requirement that SQ1 detainees and prisoners be segregated from other prisoners dictated the conditions of appellant's custody. In short, the "complained-of conditions were rationally related to reasonable operating procedures of the facility and were not so 'excessive' as to rise to the level of punishment." *James,* 28 M.J. at 216 (quoting *Wolfish,* 441 U.S. at 538, 99 S.Ct. 1861).

Appellant argues that the length of his pretrial confinement coupled with his good behavior indicates that, at some earlier time, his custody level should have been upgraded. We disagree. As the brig officer testified, maximum custody minimized opportunities for mischief; in his words, "[W]e're not going to give somebody th[e] chance to be stupid, sir." The fact that maximum custody prevented appellant from getting into trouble does not mean it was not warranted. We recognize that appellant's pretrial confinement, almost 600 days, is an extraordinarily long time for a military accused.[7] The length of appellant's pretrial confinement, however, does not allow him to dictate the conditions of that confinement. *See Palmiter,* 20 M.J. at 96; *cf. United States v. Avila,* 53 M.J. 99, 102 (2000) ("[T]he length of a prisoner's stay in segregation does not, by itself, constitute cruel and unusual punishment, but is simply a factor to be considered along with the other aspects of confinement." (citing *Hutto v. Finney,* 437 U.S. 678, 686, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978))).

Appellant also argues that classification decisions were arbitrary because one factor considered was whether the confinee was pretrial or post-trial. Master Gunnery Sergeant Murphy testified why brig officials considered this fact relevant. Many offenses under the UCMJ carry a range of punishment from nothing to a substantial period of confinement, including life imprisonment. Rape, for example, is such an offense. *Manual for Courts–Martial, United States* (1995 ed.), Part IV, para. 45e(1). Brig officials believed pretrial confinees facing the possibility of extremely lengthy sentences might be more inclined to attempt an escape than those who, after sentencing, face definite and usually significantly lesser terms. Moreover, unlike the cases appellant cites, his custody classification was based on numerous factors. *Cf. United States v. Anderson,* 49 M.J. 575, 577 (N.M.Ct.Crim.App.1998) (confinement credit awarded where accused was placed in maximum custody *solely* because of length of potential confinement he faced at court-martial).[8]

---

7. Most of this time is attributable to litigation related to his petition for extraordinary relief and defense requests for trial delays. Of course, day-for-day credit was applied against appellant's approved sentence for every day he spent in pretrial confinement. *United States v. Allen,* 17 M.J. 126 (C.M.A.1984).

8. Also, contrary to appellant's assertion, we do not believe "this type of custody procedure [had]

a coercive effect on [appellant] by 'encouraging' [him] to enter into [a] pretrial agreement[ ] and/or plead guilty simply to escape maximum custody." *Cf. United States v. Fricke,* 53 M.J. 149, 152 (accused alleged conditions of pretrial confinement were designed to produce his confession), *cert. denied,* 531 U.S. 993, 121 S.Ct. 484, 148 L.Ed.2d 457 (2000). The length of appellant's pretrial detention was due to factors out-

Like our superior court in a similar case, we hold "that the judge did not abuse his discretion in finding that the [custody] classification was supported by reasonable and legitimate governmental interests," and "[i]n considering the evidence in support of this ruling, we, like the judge, decline to engage in second-guessing the decision of the brig authorities." *McCarthy*, 47 M.J. at 167.

## III. INTERRUPTION OF APPELLANT'S SENTENCE TO CONFINEMENT

■ North Carolina released appellant to the Army's custody on the condition that "immediately after his military trial [was] completed . . . the U.S. Army [would] relinquish custody of the defendant to the Cumberland County Sheriff's Department." The court-martial sentenced appellant on 14 October 1998, and the convening authority ordered him returned to North Carolina effective 2 November 1998. In his action dated 5 March 1999, the convening authority directed that, "[i]n accordance with Article 57a(b)(1), UCMJ, 10 U.S.C. § 857a(b)(1), and Rule for Court[s]–Martial 1107(d)(3), the sentence to confinement is deferred effective 2 November 1998, until such time as [appellant] is permanently released to the armed forces by the State of North Carolina." North Carolina subsequently tried and convicted appel-

side the government's control (time to litigate the extraordinary writ and defense requests for continuances), and the nature of the detention was the result of the many factors discussed in this opinion.

9. Article 57a(b), UCMJ, states:
(1) In any case in which a court-martial sentences a person referred to in paragraph (2) to confinement, the convening authority may defer the service of the sentence to confinement, without the consent of that person, until after the person has been permanently released to the armed forces by a state or foreign country referred to in that paragraph.
(2) Paragraph (1) applies to a person subject to this chapter who—
(A) While in the custody of a state or foreign country is temporarily returned by that state or foreign country to the armed forces for trial by court-martial; and
(B) After the court-martial is returned to that state or foreign country under the authority of a mutual agreement or treaty, as the case may be.

lant of additional rapes, and there he currently serves a life sentence.

Appellant asserts the convening authority erred by deferring his sentence because the offenses occurred before 23 October 1992, the effective date of Article 57a(b)(1), UCMJ,[9] and that his court-martial sentence to confinement continues to run unabated from the date it was adjudged in accordance with Article 57(b), UCMJ.[10] *United States v. Bramer*, 45 M.J. 296, 297 (1996). The government concedes, and we agree, that the convening authority's reliance on Article 57a(b), UCMJ, was *ultra vires*, but, citing *United States v. Ellenson*, 19 M.J. 605 (A.F.C.M.R.1984), argues that R.C.M. 1107(d)(3)[11] provided independent authority to defer appellant's sentence. We also asked counsel to address whether Article 14(b), UCMJ, 10 U.S.C. § 814(b), "interrupted" appellant's court-martial sentence upon his return to North Carolina. We hold that it does. We also hold that, although not cited by either party, Army Reg. 633–30/Air Force Reg. 125–30, Apprehensions and Confinement: Military Sentences to Confinement (28 Feb. 1989) [hereinafter AR 633–30/AFR 125–30], requires that appellant's sentences to confinement adjudged by this court-martial and North Carolina run consecutively.

### *ARTICLE 14(b), UCMJ*

Article 14(b), UCMJ, states:

Article 57a(b), UCMJ, originally was designated Article 57(e), UCMJ. It was redesignated, with a slight change in wording, by § 1123(a) of Pub.L. No. 104–106 in 1996. The provisions of Article 57(e), UCMJ, were made applicable only to those offenses committed on or after 23 October 1992, the effective date of the article. National Defense Authorization Act for Fiscal Year 1993, Pub.L. No. 102–484, § 1064, 106 Stat. 2505 (1992).

10. Article 57(b), UCMJ, states, "Any period of confinement included in a sentence of a court-martial begins to run from the date the sentence is adjudged by the court-martial, but periods during which the sentence to confinement is suspended or deferred shall be excluded in computing the service of the term of confinement."

11. The President promulgated R.C.M. 1107(d)(3) in 1995 "based on . . . Article 57[a(b), UCMJ]." *Manual for Courts–Martial, United States* (2000 ed.), app. 21, Rule for Courts–Martial 1107(d)(3) analysis, at A21–84.

When delivery under this article is made to any civil authority of a person undergoing sentence of a court-martial, the delivery, if followed by conviction in a civil tribunal, interrupts the execution of the sentence of the court-martial, and the offender after having answered to the civil authorities for his offense shall, upon the request of competent military authority, be returned to military custody for the completion of his sentence.

Article 14(b), UCMJ, encourages cooperation between military and civil authorities when a sentenced servicemember in military custody also is suspected of having committed criminal offenses amenable to civilian prosecution.[12] As a result of Article 14(b), UCMJ, if civil authorities subsequently try, convict, and sentence to confinement the servicemember, the two sentences, in effect, will run consecutively. *See United States v. Bryant*, 12 U.S.C.M.A. 133, 137, 30 C.M.R. 133, 137, 1961 WL 4412 (1961) (citing *Edwards v. Madigan*, 281 F.2d 73, 77 (9th Cir.1960)).

The reach of Article 14(b), UCMJ, however, is limited to accused serving a sentence of a court-martial *before* they are delivered to civil authorities and tried and convicted by them. *See Bramer*, 45 M.J. at 298. Article 57a(b), UCMJ, on the other hand, addresses scenarios to which Article 14(b), UCMJ, may not apply. In *Bramer*, our superior court reviewed the legislative history of Article 57a(b), UCMJ, and why Congress deemed it necessary:

> [Article 57a(b), UCMJ], allows the convening authority to defer the running of a sentence to confinement when a state or foreign country has temporarily released the accused from its custody to allow the military to try the accused before a court-martial and the military is then obligated ... to return the accused to the sender state's custody after the court-martial is completed. Since Article 57(b) provides that an accused's sentence to confinement begins to run upon the date it is adjudged,

any sentence of confinement imposed by [a] court-martial would have to run concurrently with the accused's confinement by the sender state in the absence of this legislation. This would be the case regardless of the fact that the court-martial conviction was based on different crimes than those prosecuted by the sender state.

*Bramer*, 45 M.J. at 297 (quoting a letter of transmittal from the Department of Defense, *reprinted in* 141 Cong. Rec. S5812 (daily ed. Apr. 27, 1995)). Article 57a(b), UCMJ, gives the convening authority "the option of running the military sentence concurrently or consecutively" with one adjudged by a civil tribunal. *Id.*

Appellant urges us to hold Article 14(b), UCMJ, inapplicable because the facts at hand—North Carolina temporarily released appellant to the Army's custody on its promise to return him after his court-martial—are those Congress believed that Article 14(b), UCMJ, did not cover and intended Article 57a(b), UCMJ, to address. By implication, appellant argues that Article 14(b), UCMJ, and Article 57a(b), UCMJ, and R.C.M. 1107(d)(3) are mutually exclusive. The government replies that Article 14(b), UCMJ, applies by its terms, *i.e.*, because appellant was "undergoing a sentence of a court-martial" when he was returned to North Carolina for trial, delivery of appellant, followed by his conviction "in a civil tribunal," interrupted appellant's court-martial sentence.

As our superior court has held, Article 14(b), UCMJ, "makes it clear that delivery of a servicemember who is serving a sentence of confinement to civilian authorities 'interrupts the execution of the sentence of the court-martial....'" *Bramer*, 45 M.J. at 298 (quoting *Ellenson*, 19 M.J. at 606). Nothing in Article 14(b), UCMJ, limits its application to an accused initially in military custody or forecloses its application to an accused initially in civilian custody, if its terms are otherwise satisfied. Article 14(b), UCMJ, requires only that the accused first

---

12. *See, e.g.*, Army Reg. 27–40, Legal Services: Litigation, para. 2–2*a* (19 Sep. 1994) ("Army officials will cooperate with civilian law enforcement authorities who seek the surrender of a soldier in connection with criminal charges.");

Army Reg. 630–10, Personnel: Absence Without Leave, Desertion, and Administration of Personnel Involved in Civilian Court Proceedings, para. 7–1*b* (10 June 1992).

be undergoing a sentence of a court-martial when delivered to civilian authorities upon their request and subsequently be convicted by a civil court to interrupt the execution of his or her court-martial sentence. *See also* R.C.M. 1113(d)(2)(A)(ii). In the instant case, upon appellant's conviction by a civil tribunal in North Carolina, his court-martial sentence to confinement was interrupted the day he was turned over to civil authorities and it will remain interrupted until he is returned to military control.

### AR 633–30/AFR 125–30

■ We also hold that, independent of Article 14(b), UCMJ, AR 633–30/AFR 125–30 requires that appellant's two sentences run consecutively. Paragraph 4*b*, AR 633–30/AFR 125–30, states, "A sentence to confinement adjudged by court-martial will not be served concurrently with any other sentence to confinement adjudged by a court-martial or a civil court." [13]

In *Ellenson*, the Air Force Court of Military Review applied this language to the following facts: Ellenson was an airman serving a two-year sentence to confinement in a New Mexico jail when he was returned to military authorities to stand trial by court-martial. 19 M.J. at 606. Ellenson's court-martial sentence included six months confinement. Immediately after trial, he was returned to New Mexico penal authorities. *Id.* Ellenson argued that both sentences of confinement should run concurrently, not consecutively. *Id.* Our sister court observed that Article 14(b), UCMJ, assumes an accused is serving a sentence to confinement adjudged by a court-martial before his release to civilian authorities for trial by them, and that this was the reverse of the facts before them. *Id.* The court, however, broadly interpreted Article 14(b), UCMJ, to "allow [Ellenson's] military confinement to be interrupted so as to require him to complete [his] adjudged civil sentence to confinement," basing its holding in part on AR 633–30/AFR 125–30. *Id.* at 607.

In *Bramer*, a pre-Article 57a(b), UCMJ, case, our superior court held that Article 14(b), UCMJ, does not apply to an accused "first convicted in a state court, then released to the military, and then returned to civilian authorities." 45 M.J. at 298. Our superior court, however, also stated:

> The [Air Force] Court of Military Review in *Ellenson* had good reason to rely upon [AR 633–30/AFR 125–30] because in [*United States v.*] *Bryant* we had said:
>
> > Secretaries of Departments may promulgate rules and regulations, and they are presumptively valid unless arbitrary and unreasonable or contrary to or inconsistent with the Code. There is nothing arbitrary and unreasonable in requiring that multiple sentences be served consecutively, and the Code does not state that a sentence once started may not be interrupted by the misdeeds of the accused.

*Bramer*, 45 M.J. at 298 (quoting *Bryant*, 12 U.S.C.M.A. at 138, 30 C.M.R. at 138). The Court then summarized the law before Article 57a(b), UCMJ:

> [T]he clearest rule of law was that a Secretary of a Department could promulgate a regulation which determined when sentences would run concurrently or consecutively and that, at a minimum, misconduct which occurred after the first sentence to confinement began could result in a consecutive sentence.

*Id.* at 299.

In *Bramer*, the Navy had no regulation similar to AR 633–30/AFR 125–30. Therefore, our superior court held that since Article 14(b), UCMJ, did not apply, Bramer's court-martial sentence began running the day it was adjudged in accordance with Article 57(b), UCMJ, and was not tolled upon his return to state confinement. In the instant case, as in *Ellenson*, the Secretaries of the Army and the Air Force have promulgated a regulation that requires that sentences adjudged by courts-martial or civil tribunals shall not run consecutively, regardless of

---

13. AR 633–30/AF 125–30 was promulgated on 27 September 1955, 6 November 1964, and 28 February 1989 with an effective date of 28 March 1989. All three versions contain the quoted language. This regulation is consistent with the Army's longstanding policy of "requir[ing] sentences to be served independently." *Edwards*, 281 F.2d at 77.

when the accused committed the misconduct or who tried the accused first.[14]

In summary, we hold that the convening authority's decision to defer appellant's court-martial sentence to confinement pursuant to Article 57a(b), UCMJ, was *ultra vires* and of no effect; that Article 14(b), UCMJ, interrupted appellant's court-martial sentence to confinement effective upon his return to North Carolina and will continue interrupted until his return to military control; and that AR 633–30/AFR 125–30 requires that appellant's sentences adjudged by court-martial and North Carolina run consecutively. We also note that Article 14(b), UCMJ, and AR 633–30/AFR 125–30 are self-executing; no action need be taken to give them effect.[15] Lastly, given our holdings, we need not consider whether the convening authority could defer appellant's sentence to confinement without his consent pursuant to R.C.M. 1107(d)(3).

We have considered the remaining assignments of error and those matters personally asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Judge JOHNSON and Judge NOVAK concur.

---

**14.** We note that Article 14(b), UCMJ, and AR 633–30/AFR 125–30 operate somewhat differently. The latter states that a sentence to confinement *adjudged* by a court-martial sentence will not run concurrently with any other sentence to confinement *adjudged* by a court-martial or civil court. Thus, under AR 633–30/AFR 125–30 alone, appellant's court-martial sentence would have continued to run after he was released to North Carolina until a court there convicted him and he began serving an adjudged sentence to confinement. Since Article 14(b), UCMJ, also applies, however, appellant's court-martial sentence was interrupted when the Army delivered him to North Carolina.

**15.** Since Article 57a(b), UCMJ, is of no effect in this case, we need not address the relationship between it and Article 14(b), UCMJ, and AR 633–30/AFR 125–30. We note, however, that Article 57a(b), UCMJ, is designed to give the convening authority the option to defer an accused's sentence to confinement, while Article 14(b), UCMJ, and AR 633–30/AFR 125–30 operate automatically, seemingly depriving the convening authority of such discretion. Therefore, there may be a question about the continued validity of the pertinent provision of paragraph 4*b*, AR 633–30/AFR 125–30, regarding offenses committed on or after 23 October 1992, as well as a question of which article controls in the case where the facts permit applicability of either Article 14(b) or 57a(b), UCMJ.